**ALVERSON TAYLOR & SANDERS**
KURT R. BONDS, ESQ.
Nevada Bar No. 6228
6605 GRAND MONTECITO PARKWAY
SUITE 200
LAS VEGAS, NEVADA 89149
(702) 384-7000
efile@alversontaylor.com
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JULIE ZALOGA, an individual;<br><br>    Plaintiff,<br>vs.<br><br>DIAMOND RESORTS HOLDINGS, LLC, a domestic limited liability company,<br><br>    Defendant. | CASE NO.:<br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

Plaintiff, Julie Zaloga ("Plaintiff"), by and through her attorney of record, Kurt R. Bonds, Esq. of the law firm of Alverson Taylor & Sanders, and for her claims of relief against Defendant, Diamond Resorts Holdings, LLC ("Defendant"), hereby complains and alleges as follows:

**JURISDICTION AND VENUE**

1. This action arises out of Defendant's violations of Title VII of the Civil Rights act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17.

2. This court has jurisdiction over this matter under 42 U.S.C. § 2000e-2(a) and 28 U.S.C. § 1331.

3. Under 28 U.S.C. § 1391(b), venue in this District is proper because Defendant is a Nevada limited liability company registered in Nevada with its principal place of business in Las

Vegas, Nevada. Therefore, Defendant resides and is subject to personal jurisdiction in the District of Nevada.

## **PARTIES**

4. Plaintiff is an adult individual residing in the State of Arizona.

5. Defendant is a domestic limited liability company registered in the State of Nevada with its principal place of business in Las Vegas, Nevada.

## **FACTUAL ALLEGATIONS**

6. Plaintiff reincorporates by reference all preceding paragraphs as if fully set forth below.

7. Defendant is a large company that employs more than 15 employees and conducts business in many states.

8. Plaintiff was hired by Defendant on or around June 2013 as a full-time in-house sales agent at Los Abrigados Resort and Spa in Sedona, Arizona until June 2016.

9. Shortly after being hired, Plaintiff began to experience harassment by her male manager, Jeff Macaree.

10. During Plaintiff's time at Los Abrigados, Mr. Macaree made repeated comments to her that she needed to unzip her blouse to show more cleavage and hike up her skirt to get more sales.

11. Plaintiff was also told to ask single male clients to go out with her and told to try and get older clients to marry her—the older the better.

12. During this time, there were also occasions where Plaintiff was squeezed and smelled, without consent, by Carl Gatti, Defendant's Regional Vice President of Sales in Arizona.

///

13. During 2013, Defendant also endured negative comments regarding her boyfriend's appearance and was told that she was too pretty to be with him.

14. Also, after beginning her employment, Plaintiff quickly noticed that the male sales agents constantly made fun of and belittled female support staff and referred to them as "stupid bitches,"

15. The harassment and discrimination continued in Plaintiff's second year employed with Defendant.

16. On or around June 26, 2014, and without Plaintiff's permission or consent, John Rosenthal, an older sales agent, kissed Plaintiff and told her that they would be together if he wasn't married and if Plaintiff wasn't with her boyfriend.

17. Plaintiff complained of this conduct and was told that she could file a report but that her focus was in the wrong place and it would affect her sales. Her male managers told her that they thought Mr. Rosenthal's actions were "cute" and discouraged her from filing a formal complaint.

18. Despite the lack of support from her male coworkers and managers, Plaintiff spoke extensively with an employee in Defendant's Human Resource Department but ultimately decided not to file a formal complaint because she was afraid that doing so would hurt her career. Following this incident Plaintiff felt humiliated, ashamed, and ridiculed by her male coworkers and managers, which left her doubting herself and wondering if she was just being overly sensitive for feeling violated, dirty, taken advantage of, blindsided, and betrayed.

19. Later in 2014, Plaintiff was told to stop worrying about everyone else when she tried to address instances of unfair treatment that she was observing.

20. By the summer of 2015, due to Plaintiff's hard work and dedication to her work she had become one of the top selling agents for Defendant.

21. During 2015, Plaintiff noticed that he requests for time off were being denied, while at the same time the requests for time off made by the male sales agents were consistently granted.

22. Plaintiff's direct manager, Ofer Katz, and her site manager, Sophia Nichols, blamed these denials for time off on the Regional Vice President of Sales, Ronnie Crawford.

23. The sexism and discrimination Plaintiff endured continued, and during one crowded sales event someone, Plaintiff was unable to identify who, grabbed her buttocks.

24. During the summer of 2015, Plaintiff stopped eating and lost approximately 30 pounds and began drinking again after four years of sobriety due to the stress and anxiety associated with her job, in conjunction with the fact that she was consistently denied any time off while male coworkers were granted leave again and again.

25. In or around September 2015, James Shosted became the Vice President of the Los Abrigados Resort and Spa.

26. Within 30 days of Mr. Shosted promotion to Vice President, he began a targeted campaign of discrimination against Plaintiff which started with him removing Plaintiff from her sales team and manager against her wishes and placing Plaintiff on his own sales team.

27. Using his position and authority, Mr. Shosted began providing Plaintiff with less qualified clients, while simultaneously reducing her number of clients as well. This resulted in Plaintiff's loss of her position on the sales "wheel" and made it much more difficult for her to receive new clients and perform her job.

28. In or around October 2015, shortly after Mr. Shosted became the Vice President, there was an incident where Plaintiff was in significant pain from a chronic illness and requested permission to go home early since she had no more tours scheduled for that day. Mr. Shosted denied Plaintiff's request and then, just moments after Plaintiff's request a male sales agent

approached Mr. Shosted and requested permission to leave early due to a stomach ache. Mr. Shosted gave the male sales agent permission to leave and when Plaintiff inquired why the male agent's request was granted and hers denied, Mr. Shosted told Plaintiff to mind her own business and stop asking questions and spreading negativity.

29. Plaintiff's attempts to reach out to Mr. Shosted and discuss his actions were met with angry and aggressive behavior, including intimidation, baseless accusations of a negative attitude, blame for the lagging performance of the entire sales center, and threats of termination.

30. In or around January or February 2016, Plaintiff had a pre-surgery medical appointment and had received prior authorization from Mr. Shosted to leave work early for the appointment.

31. Despite the fact that he had previously given his approval, on the day of the appointment, Plaintiff was verbally harassed and berated by Mr. Shosted when she reminded him that she would be leaving early that day. Mr. Shosted denied that he had given permission and told Plaintiff that she was "negative" and that she was "bitching and complaining."

32. Later, on or around May 31, 2016, Mr. Shosted singled out Plaintiff and forced her to attend a training session not related to her job and which no male agents with Plaintiff's job position were required to attend. Being required to attend this unrelated training is a major insult within Defendant's company culture and caused significant humiliation to Plaintiff and degraded her credibility with coworkers and made her question her self-worth.

33. During 2016, Plaintiff also witnessed discrimination against another female sales agent by Mr. Shosted. That employee filed a gender discrimination complaint with Defendant's Human Resource Department and was subsequently retaliated against and fired. Observing these events made Plaintiff fearful to make any complaints and made her decide to stay quiet and just try to keep doing her job.

34. As 2016 progressed Plaintiff began to be denied opportunities to interact with new clients which prevented her from being able to perform her job.

35. In or around July 2016, Plaintiff transferred to the Scottsdale Villa Mirage in Phoenix, Arizona where she worked part-time as an in-house sales agent on the travel team to try and get away from the oppressive harassment and discrimination she suffered under Mr. Shosted.

36. Three weeks after transferring to Scottsdale Villa Mirage, Plaintiff received approval from her new manager, Peter McGowan, and the site Vice President of Sales, Luke Lamprey, to transfer to a resort in North Carolina.

37. Less than 24 hours before she was supposed to move to North Carolina, Plaintiff received a call from Susie Heller (Mr. McGowan's wife and boss) denying the transfer. The reason given for the denial was that Plaintiff had not been in her position for the minimum requirement of six months. However, shortly thereafter, a male coworker was allowed to transfer from Las Vegas to Phoenix and then to Florida all within a three month period.

38. Because Plaintiff was given less than 24 hours' notice that the decision to approve her transfer was being changed, Plaintiff had already paid to break her apartment lease and had gotten rid of essentially all her household items in preparing to move to North Carolina. Plaintiff was forced to find a more expensive apartment and replace her household goods due to the last minute change or heart on her transfer.

39. Following this denial of transfer, Mr. McGowan began denying Plaintiff opportunities to receive clients, and instead gave many of those client interactions to Mr. Shosted's sister. Plaintiff's managers continually ignored her and refused to provide her with opportunities to interact with clients and make sales.

40. During Plaintiff's time on the traveling team, and following the unexpected denial of her transfer, Plaintiff became depressed because she was always traveling to different hotels

but only allowed to sit around all day and was not given any actual tours. This was very hard on Plaintiff emotionally and physically, and in addition to the depression Plaintiff gained significant weight because of the emotional and physical stress she was subjected to.

41. Additionally, in or around October, during a discussion with Mr. McGowan, Plaintiff was told to shut-up because she was a woman.

42. In or around May 2017, another of Plaintiff's female coworkers filed a gender discrimination complaint with Defendant.

43. Upon information and belief, Defendant performed no investigation into this complaint and responded that they found no wrongdoing.

44. In or around March 2017, Plaintiff was transferred back to the Los Abrigados location in Sedona into the Quality Assurance department.

45. Just a couple months later, in or around June or July 2017, Plaintiff was transferred, without a choice in the matter, to the Sedona Summit location, Mr. Shosted's home site. Plaintiff was told not to worry about Mr. Shosted because he did not have jurisdiction over the Quality Assurance department.

46. Unfortunately, although not surprisingly, once Plaintiff was transferred to Mr. Shosted's location, he began to routinely single out Plaintiff and interfere with her job functions.

47. Upon information and belief, Mr. Shosted intentionally prevented Plaintiff's female boss, Jenna Ekwall, from providing Plaintiff with the assistance she needed by excluding Ms. Ekwall from meetings and communications and ignoring her emails.

48. Mr. Shosted made it a point to reprimand Plaintiff in front of other employees, spread misinformation related to Plaintiff's job skills and qualifications, and repeatedly threatened her job and belittled her.

///

49. Additionally, Mr. Shosted demanded that Plaintiff talk to him and only him, or she would lose her job.

50. These forced interactions with Mr. Shosted re-established the fear she had felt before when she was working around him and forced her to interact daily with her primary abuser, which caused her significant emotional and physical distress.

51. After being transferred to Mr. Shosted's location, Plaintiff was also subjected to increased harassment and discrimination by the sales agents under Mr. Shosted.

52. In particular, Joe Markham, a sales agent at the Sedona Summit location would regularly make inappropriate and harassing comments to Plaintiff. On multiple occasions he asked her to feel his biceps, he would flex his buttocks and ask Plaintiff to comment on or touch them, and he often asked her to go out with him and come to his house for wine and sex. Plaintiff always refused these unwanted advances and made it clear that such propositions were unwanted and unwelcome.

53. On another occasion, in or around November 2017, Mr. Markham, asked Plaintiff if she wanted to see his penis. Plaintiff told him that she did not want to see his penis, but just minutes later he put his phone right in front of Plaintiff's face and showed her a picture of his genitals. He then asked Plaintiff to show him a picture of her genitalia and said she owed him a picture since he had shown her one.

54. Plaintiff talked with other female employees who informed her that this behavior from Mr. Markham was a regular occurrence and that he did it all the time.

55. During her time at Sedona Summit, Plaintiff was regularly referred to as "kiddo" by the male sales agents, and Mr. Shosted often referred to her as "hysterical."

///

///

56. Towards the end of 2017 or beginning of 2018, Plaintiff learned of an incident in which Mr. Markham pushed and belittled a male supervisor who was standing up for an older female employee.

57. Also during 2017, Plaintiff was made to clean urine and feces out of the men's restroom because she wasn't busy, the male managers and sales agents weren't going to do it, and because she was a woman and cleaning the bathroom was "women's work." Similar comments were made a second time when Plaintiff was forced to clean the restrooms again.

58. Cleaning the restrooms was not a part of Plaintiff's job description in the Quality Assurance department, but she was forced to clean them because she was a woman.

59. Towards the end of 2017 Plaintiff's retention numbers were lower than the company expected, in part due to the hostile work environment Plaintiff faced at work and the continual harassment and discrimination interfering with her ability to do her job.

60. Ms. Ekwall informed Plaintiff that she would not be allowed to have certain interactions with clients and would only be allowed to do frontline deals during December.

61. In or around December 2017, Plaintiff had a meeting with Ms. Ekwall and Mr. Shosted regarding this 30 day warning limited suspension period. Mr. Shosted hijacked the meeting and demanded, upon threat of being fired, that Plaintiff speak to no one except him about why she was being suspended. This isolated her from her coworkers and severely damages her reputation among the sales agents and other employees. During this time Plaintiff was replaced by an inexperienced male employee.

62. Plaintiff was forced to sit in on every tour but refused to allow her to participate and earn any money from the tours.

///

///

63. Just a few months before, a male employee in Plaintiff's department who had worse retention numbers than Plaintiff only received a two day suspension and was not forced to sit in on every tour, as was Plaintiff.

64. Then, on or around February 22, 2018, Plaintiff noticed that Mr. Markham was not informing a customer of all the essential terms of the contract. As part of her role in the Quality Assurance department Plaintiff approached Mr. Markham to request that he correct the violation.

65. At this point, Mr. Markham became upset, put his arm around Plaintiff, and pulled her close, squeezing her against his body. He brought his lips to her ear and said, "Sweetheart, I am the number one salesperson here, I'm worth millions to this company, I have been doing this for years and I don't need your help, don't tell me how to do my job."

66. Plaintiff pulled away and asked Mr. Markham to stop belittling her and to act professionally. She then attempted to explain that she didn't make the rules that sales agents were supposed to follow but that it was her job to make sure the rules were followed.

67. Mr. Markham responded by calling Plaintiff "sweetie" and telling her not to tell him how to do his job.

68. A male manager, Reuben Philo witnessed this exchange and did nothing to prevent Mr. Markham's inappropriate harassment.

69. Following this disturbing event, Plaintiff approached Mr. Shosted to request help in correcting the violation of standard operating procedure. However, rather than provide help or advice, Mr. Shosted berated and humiliated Plaintiff and threatened her job because she did not agree to cover up or ignore the violation by Mr. Markham.

///

///

70. These actions by Mr. Shosted were done in front of Plaintiff's male coworker, Dave Lamparter. After berating and belittling Plaintiff, and in front of Plaintiff, Mr. Shosted apologized to Mr. Lamparter for the fact that he had to witness the reprimand.

71. Upon information and belief, Mr. Shosted then provided an inaccurate report of the incident to Tony Kowal, the Regional Vice President of Quality Assurance.

72. In a meeting with Mr. Kowal and Ms. Ekwall regarding the event, it was confirmed to Plaintiff that there have been other complaints about Mr. Shosted. Mr. Kowal and Ms. Ekwall also confirmed that Mr. Shosted has rage toward Plaintiff.

73. Also during this conversation, Mr. Kowal and Ms. Ekwall agreed that there is a culture of harassment and sexism and that Mr. Shosted used fear and intimidation to lead. They also confirmed that they were aware of the culture but stated that they could do nothing to help Plaintiff and that the culture is normal for the company.

74. Ms. Ekwall also confirmed that she had been shown pictures of Mr. Markham's genitalia as well and that she had been subjected to his advances as well. Mr. Ekwall told Plaintiff the key to getting through it was to "keep her head down" and "do her fucking job."

75. As a part of Plaintiff's job responsibilities, there were also certain requirements that had to be met to make sure that contracts complied with Automatic Clearing House requirements.

76. In order to prevent customers from defaulting on their new contracts, Defendant offered automatic withdrawals from the customers' bank account or credit card through a service called Automatic Clearing House (ACH).

77. Part of Plaintiff's responsibilities within Quality Assurance was to keep customer retention high and contract cancellations low. The pay that Plaintiff received was heavily dependent on her retention numbers.

78. During 2017, Defendant issued a company directive to encourage sales agents to get customers to accept ACH in their contracts.

79. On three different occasions, in or around June 2017, November 2017, and February 2018, Plaintiff approached Mr. Shosted to get the status of certain contracts she was working on corrected, in accordance with the company directive regarding ACH. However, Mr. Shosted refused to provide Plaintiff with any assistance which prevented her from doing her job and imperiled her job because the ACH metric was a crucial factor in evaluating her job performance.

80. Mr. Shosted had previously promised to ensure that all deals were ACH compliant. However, Mr. Shosted went back on his word and refused to help ensure that Plaintiff's deals were ACH compliant. This cause Plaintiff to lose bonuses associated with her job performance and was a specific, targeted effort by Mr. Shosted to prevent Plaintiff from being able to perform her job.

81. Upon information and belief, Defendant has received numerous and consistent complaints regarding Mr. Shosted's sexist attitude and behavior, and his consistent and continued harassment and discrimination.

82. During her employment, Plaintiff was consistently subject to communications from male managers that was rude, berating, dismissive, and annoyed. Additionally, Plaintiff as consistently subject to hostility, rudeness, flirting, invitations for dates, and other unwanted sexual advances from male coworkers.

83. Finally, in March 2018, Plaintiff had endured all the discrimination harassment she could handle and had to resign from her employment with Defendant to escape the discrimination and harassment.

84. Her last date of employment with Defendant was March 15, 2018.

85. On August 25, 2018, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) regarding the persistent discrimination and harassment she had endured during her employment with Defendant.

86. Plaintiff received a Notice of Right to Sue from the EEOC on September 26, 2018.

**FIRST CLAIM FOR RELIEF**
**(Sexual Harassment in Violation of 42 U.S.C. § 2000e-2(a))**

87. Plaintiff reincorporates by reference all preceding paragraphs as if fully set forth below.

88. Plaintiff is a female who was employed by Defendant.

89. During her employment with Defendant, Plaintiff was subjected to unwelcome, offensive, and harassing discriminatory conduct that was directed at her by her managers and coworkers, and this conduct was based upon and directed at Plaintiff because of her gender.

90. Plaintiff complained of this conduct to supervisors and Defendant's Human Resource Department, but was informed that filing a formal complaint would hurt her career and there was nothing that could be done.

91. Defendant failed to take any corrective action during Plaintiff's employment to prevent or stop this discrimination and harassment.

92. The discrimination and harassment was so severe and pervasive that it caused Plaintiff to suffer physical and mental harm. It unreasonably interfered with Plaintiff's physical and mental health, as well as her work performance in such a way and to such a degree that it created an intimidating, hostile work environment.

93. Plaintiff was forced to endure unwanted sexual advances, comments on her sexual performance, exposure to photos of male coworker's genitalia, requests for photos of her genitalia, and many degrading comments based on her gender and/or sex.

94. The conditions created by Defendant were so intolerable and unreasonable that Plaintiff was forced to resign in order to escape the severe and pervasive sexual harassment and discriminatory culture that exists within Defendant.

95. As a direct and proximate result of Defendant's actions and/or inaction, Plaintiff has suffered actual damages in an amount to be proven at trial.

96. Plaintiff has been forced to retain an attorney to pursue these claims and is therefore entitled to attorney's fees, plus actual costs incurred, pursuant to 42 U.S.C. § 2000e-5.

## SECOND CLAIM FOR RELIEF
### (Sex Discrimination in Violation of 42 U.S.C. § 2000e-2(a))

97. Plaintiff reincorporates by reference all preceding paragraphs as if fully set forth below.

98. Plaintiff is a female who was employed by Defendant.

99. Plaintiff was a high performing sales agent and dedicated employee of Defendant's Quality Assurance department throughout her tenure employed by Defendant.

100. Plaintiff was repeatedly subjected to discrimination on the basis of her gender and/or sex.

101. Throughout her employment with Defendant, Plaintiff's managers denied her certain benefits of employment, including but not limited to bonuses, necessary tools, interactions with clients, and support needed to perform her job, because she is a woman.

102. Statements made by Plaintiff's managers and other coworkers show a general culture of sexism that prevented Plaintiff from succeeding in her job.

103. Some of Plaintiff's managers directly targeted her because she was a woman and prevented her from doing her job and receiving the pay that comes from meeting certain goals and performance standards.

KB/86

104. During this time, male employees in similar positions as Plaintiff were given opportunities that were denied to Plaintiff.

105. This discrimination has caused Plaintiff to miss out on certain bonuses, job assignments, training, and/or other benefits associated with her employment.

106. The conditions created by Defendant were so intolerable and unreasonable that Plaintiff was forced to resign in order to escape the severe and pervasive sexual harassment and discriminatory culture that exists within Defendant.

107. As a result of the discrimination and Defendant's failure to take any action to prevent or remedy it, Plaintiff has also suffered humiliation, emotional distress, and physical harm.

108. As a direct and proximate result of Defendant's actions and/or inaction, Plaintiff has suffered actual damages in an amount to be proven at trial.

109. Plaintiff has been forced to retain an attorney to pursue these claims and is therefore entitled to attorney's fees, plus actual costs incurred, pursuant to 42 U.S.C. § 2000e-5.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1. For compensatory damages including lost wages, past and future and/or impairment of power to earn money; and physical pain, emotional distress and humiliation, past and future;

2. For punitive damages to punish Defendant for its willful, wanton, oppressive, malicious, and/or grossly negligent conduct;

3. Trial by jury on all issues so triable;

4. Reasonable attorney's fees and costs expended herein;

5. Pre-judgement and post-judgment interest; and

KB/86

6. Any and all other relief to which she may be entitled.

DATED this 21st day of December, 2018.

                                                      ALVERSON TAYLOR & SANDERS

                                                      KURT R. BONDS, ESQ.
                                                      Nevada Bar No. 6228
                                                      6605 GRAND MONTECITO PARKWAY
                                                      SUITE 200
                                                      LAS VEGAS, NEVADA 89149
                                                      (702) 384-7000
                                                      efile@alversontaylor.com
                                                      *Attorney for Plaintiff*

N:\kurt.grp\CLIENTS\86\Julie Zaloga Complaint.docx

16                  KB/86